# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HENRY INDUSTRIES, INC., | ) | No. 73234-0-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF LABOR and | ) | PUBLISHED |
| INDUSTRIES OF THE STATE OF | ) | |
| WASHINGTON, | ) | FILED: August 29, 2016 |
| | ) | |
| Respondent. | ) | |
| | ) | |

Cox, J. — At issue in this appeal is whether 33 drivers who contracted with Henry Industries Inc. (HII) to perform courier services for third parties are "workers" under the Industrial Insurance Act (IIA). The Department of Labor and Industries decided that these drivers are "workers" under the act. The Department then assessed penalties against HII for its failure to pay the premiums due for them for 2010, the year audited. The Board of Industrial Insurance Appeals (BIIA) agreed. We hold that substantial evidence supports the BIIA's findings of fact and that these findings support the BIIA's conclusions of law. We affirm.

HII provides warehouse, logistic, and courier services to PharMerica, a pharmacy selling pharmaceutical products and packages to long-term healthcare

facilities in Washington. HII contracts with independent contractors who actually drive on various routes to deliver pharmaceutical products for PharMerica.

HII uses "route drivers" and "stat drivers" to fulfill PharMerica's delivery needs. Route drivers make repeated deliveries, generally at the same time six days per week, and are paid a flat fee. Stat drivers make deliveries on an on call basis.

HII requires all drivers to sign a standard form cartage agreement that primarily sets forth the terms and conditions of the parties' relationship. For example, the agreement states that the driver is an independent contractor. It also requires the driver to provide a vehicle for the performance of the required services. It requires the driver to adhere to a "Manner of Performance of Service" that specifies detailed requirements. Among them is a requirement to "successfully complete all background screening requirements as set forth in this Agreement."[1] The driver must also "successfully complete all alcohol and drug screening requirements."[2] The driver also agrees to deliver route schedules to HII and its customers and further agrees to modify the schedules to meet the customers' requirements. There are additional requirements that we discuss later in this opinion.

Route drivers arrive at the pharmacy at designated times, ensure that serial numbers match the tags on the packages, load their vehicles, and drive their routes to deliver the packages. Stat drivers are called by HII dispatch when

---

[1] Trial Exhibit 20 § 3.

[2] Id. § 3c.

an order is ready for delivery. The driver picks up the item, confirms the pickup with dispatch, makes the delivery, and then confirms the delivery with dispatch.

The Department of Labor and Industries audited HII for calendar year 2010, determining that HII did not report 33 drivers as "workers" covered by the IIA. In October 2011, the Department assessed penalties against HII for its failure to pay workers' compensation premiums for these 33 drivers for calendar year 2010, the year audited. In January 2013, the Department modified its assessment of penalties.

HII appealed the Department's modified assessments order to the BIIA. An administrative law judge conducted a hearing and issued a proposed decision and order in HII's favor. The Department petitioned for review. The BIIA disagreed with its administrative law judge and issued its own decision and order, affirming the Department's modified assessment order.

HII timely sought judicial review in the superior court, which affirmed the BIIA's decision and order.

HII appeals from the superior court's judgment.

## STANDARD OF REVIEW

The Administrative Procedure Act governs judicial review of BIIA decisions on industrial insurance premium assessments.[3] On appeal from the superior court, this court "sit[s] in the same position as the superior court and review[s] the agency's order based on the administrative record rather than the superior

---

[3] RCW 51.48.131; B & R Sales, Inc. v. Dep't of Labor & Indus., 186 Wn. App. 367, 374, 344 P.3d 741 (2015).

court's decision."[4] "An employer challenging the validity of the agency action assessing industrial insurance premiums bears the burden of showing that the premiums were assessed incorrectly."[5]

We review the BIIA's findings of fact under the substantial evidence standard, which is evidence sufficient to persuade a fair-minded, rational person of the finding's truth.[6] We also "view the evidence in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority."[7]

The BIIA's conclusions of law must also flow from its findings.[8] We review de novo the BIIA's legal conclusions, but give "'substantial weight to the agency's interpretation when the subject area falls within the agency's area of expertise.'"[9]

Washington courts have expressed differing views on how to review whether an individual is a "worker" under RCW 51.08.180. In deciding the question of the proper standard of review to apply, we are guided by the supreme court's decision in Tapper v. Employment Security Department.[10]

---

[4] B & R Sales, Inc., 186 Wn. App. at 374.

[5] Id. at 375.

[6] Id.

[7] Brown v. Dep't of Soc. & Health Servs., 190 Wn. App. 572, 593, 360 P.3d 875 (2015).

[8] Gorre v. City of Tacoma, 184 Wn.2d 30, 36, 357 P.3d 625 (2015).

[9] B & R Sales, Inc., 186 Wn. App. at 375 (quoting Dep't of Labor & Indus. v. Mitchell Bros. Truck Line, Inc., 113 Wn. App. 700, 704, 54 P.3d 711 (2002)).

[10] 122 Wn.2d 397, 858 P.2d 494 (1993).

That case involved judicial review of an administrative agency decision. Review in such cases is governed by the Administrative Procedure Act (APA), which specifies the standards of review of both factual findings and legal conclusions of such an agency.

The supreme court had to review whether the agency's Commissioner had correctly decided that a worker was discharged due to "misconduct connected with his or her work."[11] That is the statutory standard for determining whether a claimant is disqualified from receiving unemployment benefits.

The supreme court concluded that whether a particular employee met this statutory standard is a mixed question of law and fact.[12] That is so, according to the court, because it requires an application of legal precepts—the definition of "misconduct connected with his or her work"—to factual circumstances—the details of the employee's discharge.[13]

According to the court, reviewing such a mixed question requires, first, establishing the relevant facts.[14] Second, the court determines the relevant law.[15] Third, the court applies the law to the established relevant facts.[16]

---

[11] RCW 50.20.060.

[12] Tapper, 122 Wn.2d at 402-03.

[13] Id. at 402.

[14] Id. at 403.

[15] Id.

[16] Id.

Similar reasoning applies here to our review of the BIIA's decision and order. As in Tapper, we review this administrative agency's decision and order on the basis of the review standards specified in the APA. Specifically, we review the BIIA's factual findings for substantial evidence and its legal conclusions de novo.

Here, the question is whether the 33 drivers meet the statutory standard of "worker" under RCW 51.08.180. If so, that triggers HII's obligation to pay workers' compensation premiums for these drivers.

Specifically, this statutory definition requires that each driver is "working under an independent contract, the essence of which is his or her personal labor."[17] We conclude that whether a particular driver meets these requirements is a mixed question of law and fact. As in Tapper, this requires the application of legal precepts—the statutory definition of "worker"—to the factual circumstances of a case. These factual circumstances include the factual details underlying whether the drivers are "working under an independent contract."[18] Likewise, these factual circumstances include the factual details underlying whether "the essence [of the work] is his or her personal labor."[19]

Accordingly, we first determine whether substantial evidence supports the BIIA's findings on these two related factual inquiries. We then apply the relevant law to the findings that are supported by substantial evidence.

---

[17] RCW 51.08.180.

[18] Id.

[19] Id.

In their briefing to this court, the parties agree that a mixed question of law and fact is before us. But they differ on what falls into each category. In doing so, they either rely on or challenge three court of appeals decisions, each of which originates from a different division of this court.[20]

We disagree with these court of appeals decisions to the extent they differ from Tapper. First, none mentions the analysis in Tapper, which we conclude controls for the reasons we just discussed. Second, each of the court of appeals decisions focuses on parts of the statutory definition of "worker." In our view, that focus is too narrow. That is because such focus does not include the full scope of the definition of "worker." For these reasons, we apply the Tapper analysis to our review in this case.

## "WORKER"

HII primarily argues that the drivers' personal labor was not the essence of their contracts with HII. Rather, it claims that the drivers are not "workers" under the IIA because "the use of vehicles is critical to completing the delivery services" they provide. This argument is unpersuasive.

---

[20] B & R Sales, Inc., 186 Wn. App. at 376 ("The nature of the contracts, what services the independent contractors provided, and other related issues are questions of fact that we review for substantial evidence. But whether based on these facts the contractors are 'workers' involves the interpretation of RCW 51.08.180. Statutory interpretation is a question of law that we review de novo."); Silliman v. Argus Servs., Inc., 105 Wn. App. 232, 236, 19 P.3d 428 (2001) ("What services [the contracting firm] provided is a question of fact; whether these services constitute "personal labor" within the meaning of the statute is a question of law."); Dana's Housekeeping, Inc. v. Dep't of Labor & Indus., 76 Wn. App. 600, 608, 886 P.2d 1147 (1995) ("Whether the essence of the work is personal labor is a factual determination.").

RCW 51.08.180 defines "worker" as follows:

"Worker" means every person in this state who is engaged in the employment of an employer under this title, whether by way of manual labor or otherwise in the course of his or her employment; *also* every person in this state . . . *who is working under an independent contract, the essence of which is his or her personal labor* . . . .[21]

Our first inquiry is whether substantial evidence supports the BIIA's findings of fact. We focus on Finding of Fact 5, to which HII assigns error:

During the first, second, third and fourth quarters of 2010 the individuals were working under independent contracts, the essence of which was their personal labor.[22]

In this case, the parties agree that all 33 drivers work under independent contracts. So, we need not further review the underlying facts of this relationship. Substantial evidence supports this aspect of the BIIA's decision and order.

Whether there is substantial evidence to support the remainder of the definition of "worker" is the issue.

In its decision and order, the BIIA identified evidence in the record about the individual drivers' labor. For example, the cartage agreement that each driver signed lists specific requirements that drivers must comply with, but it is not specific with respect to the vehicles that the drivers must supply to perform the courier services.

The drivers must also be fluent in English.

---

[21] RCW 51.08.180 (emphasis added).

[22] Administrative Record at 8.

They must also complete drug, alcohol, and background screening. The drug screening is random. The initial background screening is followed by periodic screening thereafter. A negative report in any background check is a ground for immediate termination.

The drivers are also required to promote HII's best interests.

We conclude from this evidence that there is substantial evidence to support the BIIA's Finding of Fact 5.

We next review de novo the BIIA's application of the law to its supported finding.

RCW 51.08.180 provides in relevant part:

"Worker" means every person in this state who is engaged in the employment of an employer under this title, whether by way of manual labor or otherwise in the course of his or her employment; also every person in this state . . . *who is working under an independent contract, the essence of which is his or her personal labor* . . . .[23]

The plain words of this statute define "worker" in two ways. The first is the typical way—the common employer and employee relationship. The second extends "worker" status to certain independent contractors: those "working under an independent contract, the *essence* of which is his or her personal labor."[24]

The supreme court recently reiterated long-standing law on how to determine the "essence" of a contract. In Department of Labor & Industries v. Lyons Enterprises, Inc., the court held that:

---

[23] RCW 51.08.180 (emphasis added).

[24] Id. (emphasis added).

9

To establish whether the essence of a contract is personal labor, "we look to the contract, the work to be done, the situation of the parties, and other attendant circumstances." "Essence," as we have previously defined it, refers to "the 'gist or substance, the vital sine qua non, the very heart and soul'" of the contract between the independent contractor and the employer. When considering whether a contract's essence is personal labor, "[w]e focus on the realities of the situation rather than the technical requirements of the test."[25]

"A core purpose of the IIA is to allocate the cost of workplace injuries" to the industry that generates them, so employers make workplaces safer.[26] Accordingly, the IIA is "'liberally construed' . . . to further the purpose of providing compensation to all persons injured in their employment, with all doubts resolved in favor of the worker."[27]

"The [IIA] requires employers to report and pay workers' compensation premiums for all covered workers."[28] "No employer or worker shall exempt himself or herself from the burden or waive the benefits of this title by any contract . . . and any such contract . . . shall be pro tanto void."[29]

With these principles in mind, we now consider the seminal supreme court case considering whether the essence of a particular independent contract is the

---

[25] ___ Wn.2d. ___, 374 P.3d 1097, 1104 (2016) (emphasis omitted) (alteration in original) (citations omitted) (first quoting Lloyd's of Yakima Floor Ctr. v. Dep't of Labor & Indus., 33 Wn. App. 745, 749, 662 P.2d 391 (1982); then quoting Id. at 751; and then quoting B & R Sales, Inc., 186 Wn. App. at 377).

[26] Harry v. Buse Timber & Sales, Inc., 166 Wn.2d 1, 19, 201 P.3d 1011 (2009).

[27] B & R Sales, Inc., 186 Wn. App. at 379 (quoting RCW 51.12.010).

[28] Lyons Enters., Inc., 374 P.3d at 1099.

[29] RCW 51.04.060.

independent contractor's personal labor. That case is <u>White v. Department of Labor and Industries</u>.[30]

In addressing that question, the court considered four of its prior cases, each of which had different factual backgrounds. It then turned to the facts of the case before it.

There, a sawmill owner either owned or purchased timber on a tract of land.[31] Initially, the sawmill owner hired an individual to process the timber.[32]

Lucinda May White, who later became a claimant of benefits under the IIA, and her husband owned a "donkey engine."[33] They orally agreed with the sawmill owner to move their donkey engine to the tract of land where an individual had previously handled the timber processing.[34] The Whites agreed to begin processing the logs.[35]

---

[30] 48 Wn.2d 470, 294 P.2d 650 (1956).

[31] <u>Id.</u> at 475.

[32] <u>Id.</u>

[33] A "donkey engine" is composed of a single-cylinder steam engine that is connected to a horizontal capstan. They are mounted together on several log skids. By wrapping cables around the capstan, the engine can pull huge loads that would otherwise require animal power. David Wilma, <u>John Dolbeer Invents the Donkey Engine and Revolutionizes Logging in August 1881</u> (March 1, 2003), HISTORYLINK.ORG, http://www.historylink.org/index.cfm?DisplayPage=output.cfm&file_id=5331 [https://perma.cc/8TQJ-CFL5].

[34] <u>White</u>, 48 Wn.2d at 475.

[35] <u>Id.</u>

According to the supreme court, all parties conceded that the Whites were independent contractors for the job.[36] Mrs. White's duties consisted of operating the donkey engine.[37] Her husband performed other duties.[38]

The court stated that the parties "recognized that, without the donkey engine, the Whites could not have performed the contract." Significantly, Mrs. White testified that they were approached for the work because "'[they] had equipment.'"[39]

Mrs. White was seriously injured while operating the donkey engine during performance of the contract.[40] The Department of Labor and Industries rejected her claim for benefits because she was not covered under the IIA.[41]

On appeal, the superior court reversed.[42] It concluded that Mrs. White's personal labor was the essence of the contract between the Whites and the sawmill owner.[43]

---

[36] Id.

[37] Id.

[38] Id.

[39] Id.

[40] Id. at 476.

[41] Id.

[42] Id.

[43] Id.

The supreme court reversed. It identified three independent reasons for doing so.[44] The court held that the Whites' personal labor was not the essence of the contract:

(1) because the Whites had of necessity to furnish expensive machinery and equipment, *i.e.*, the donkey engine (as distinguished from the usual hand tools), to be able to perform the contract; (2) because after the modification of the contract the contracting parties knew that the independent contractors, the Whites, could not personally perform all the labor required by the contract; and (3) because after the modification of the contract the Whites did employ [another person] to do part of the work they had contracted to perform.[45]

Here, the parties dispute whether the first and third alternative tests of White were met. The second test is not at issue here. Specifically, the BIIA stated in its decision and order that there is no evidence to show that the services required the work of helpers, as the second of the above tests requires.

*Special Equipment to Perform*

The first test under White, as we read that decision, is concerned with whether special equipment is required to perform the contract. We say this because the supreme court contrasted the special equipment—the donkey engine in that case—with "usual hand tools."[46] In doing so, the court acknowledged that ordinary equipment may be used in performing an agreement without making that simple fact determinative in deciding the essence of the agreement. We also note that in its recent decision in Lyons Enterprises, Inc.,

---

[44] Id.

[45] Id. at 476-77.

[46] Id. at 477.

13

the court characterized the first of the White tests to require the use of "specialized tools" in the performance of the contract in order for personal labor to not be the essence of the contract.[47]

In White, the specialized equipment was the donkey engine. That equipment was the essence of that contract. It allowed the Whites to process the logs more efficiently than the individual that processed the logs before they were hired.

Significantly, the supreme court stated that Mrs. White testified that she and her husband were approached for the work because "'[they] had equipment.'"[48] Thus, the fact that she operated the donkey engine did not mean that her personal labor was the essence of that contract. Accordingly, she was not a "worker" under the IIA.

Here, there simply is no persuasive argument that the vehicles the drivers are required to provide constitute special equipment, as opposed to ordinary equipment, to perform the courier services under the agreements. Without question, vehicles are required to perform the services. But there simply is nothing in this record to suggest that the vehicles required to do this job are analytically equivalent to the donkey engine in White.

The agreements that the drivers are required to sign do specify that the vehicles must have functioning locks. This appears to be a requirement because the drivers transport controlled substances. But we do not see anything special

_____

[47] Lyons Enters., Inc., 374 P.3d at 1106.

[48] White, 48 Wn.2d at 475.

14

about the requirement that the vehicles have locks. Most vehicles have locks. And HII fails to point to anything else about vehicle requirements that makes them specialized equipment.

We equate the vehicles in this case with the "usual hand tools" to which the court referred in White.[49] Thus, the mere fact that vehicles are necessary to perform the services in this case does not make the vehicles the essence of these agreements.

This view is consistent with the supreme court's recent decision in Lyons Enterprises, Inc. It cited, with approval, Department of Labor and Industries v. Tacoma Yellow Cab Co.,[50] the decision of Division Two of this court.[51] This court rejected Tacoma Yellow Cab's claim that its independent contractor drivers were not "workers." The realities of the relationship between the company and its independent contractor drivers was "'simply that the *essence* of the independent lease contract [was] to provide a method to place taxis and drivers on the city streets of Tacoma to carry passengers at rates which are established by local ordinances.'"[52] "[T]he function of these drivers was no different" from that of the

---

[49] Id. at 477.

[50] 31 Wn. App. 117, 639 P.2d 843 (1982).

[51] Lyons Enters., Inc., 374 P.3d at 1104.

[52] Id. (alteration in original) (quoting Tacoma Yellow Cab Co., 31 Wn. App. at 124).

actual employees of the company.[53] Thus, the taxi drivers' personal labor was the essence of their contracts.[54]

Similarly, in Lloyd's of Yakima Floor Center v. Department of Labor and Industries, Division Two of this court concluded that the contractors' personal labor was the essence of their contracts.[55] In that case, the firm sold floor covering materials and arranged for contractors to install the materials.[56] The contractors owned their own trucks and carpet-laying hand tools.[57] The firm did not exercise control over the contractors' installation methods as they were experts.[58]

In its reasoning, Division Two of this court stated:

We do not believe that a truck used to transport floor covering materials to a jobsite is the type of necessary machinery or equipment which, under White, would take this agreement outside the operation of the act. This requirement is concerned with those arrangements where the *machinery* and not the labor is the *primary object* of the agreement.[59]

Here, the Manner of Performance of Service section of the agreements specifies what, we conclude from the realities of the situation, constitute the

---

[53] Id.

[54] Tacoma Yellow Cab Co., 31 Wn. App. at 124.

[55] 33 Wn. App. 745, 751, 662 P.2d 391 (1982).

[56] Id. at 747.

[57] Id. at 750.

[58] Id.

[59] Id. at 751.

personal labor of each driver. The driver agrees, among other things, to "faithfully and diligently devote" his or her "best efforts, skill, and abilities to comply with customer requirements" and to "promote [HII's] welfare and best interests."[60]

Consistent with this requirement, drivers submit their delivery route schedules to the customer and HII.[61] The drivers must also update and modify their schedules if required to meet customer demands.[62] Drivers must wear an identification badge in accordance with customer requirements.[63]

Drivers must pass background checks as well as drug and alcohol screening.[64] Failure to comply with any of these requirements subjects drivers to immediate termination.[65]

Based on these agreement requirements and the testimony below, the realities of the situation show that the drivers' personal labor is the essence of their agreements.

---

[60] Trial Exhibit 20 § 3i.

[61] Id. § 3h.

[62] Id.

[63] Id. § 3g.

[64] Id. § 3c.

[65] Id. § 3d.

Although the drivers must provide their own vehicles to make deliveries, it is not "the type of necessary machinery or equipment which, under White, would take this agreement outside the operation of the [IIA]."[66]

HII relies on the dissent in the BIIA's decision and order and In re: Yellow Book Sales & Distribution Co., Inc.,[67] a BIIA significant decision, to support its argument that the drivers' personal labor is not the essence of these agreements. That reliance is misplaced.

In that case, Yellow Book entered into independent contractor agreements with 72 individuals to distribute telephone books.[68] The BIIA concluded that the independent contractors' personal labor was not the essence of their contracts.[69]

These independent contractors agreed to deliver the telephone books within three days of picking up the books and "had to own or supply" an automobile to conduct deliveries.[70] They "freely chose" the routes, and Yellow Book did not assign routes or supervise the contractors.[71] The contractors could also employ other people to do all or part of the contracted work without notice to

---

[66] Lloyd's of Yakima Floor Ctr., 33 Wn. App. at 751.

[67] No. 10 11146, 2011 WL 1903472, at *1 (Wash. Bd. of Indus. Ins. Appeals Mar. 30, 2011).

[68] Id. at *2.

[69] Id.

[70] Id.

[71] Id.

Yellow Book and without Yellow Book's agreement.[72] Some of the contractors could work without assistance but those that chose to deliver along multiple routes had to obtain assistance to perform the contract.[73]

Here, as in Yellow Book Sales & Distrib., the agreements permit drivers to hire others to make deliveries.[74] But conversely, these other drivers, referred to as Contractor Workers, must comply with the agreement provisions.[75] For example, they must have training and "possess such competence and qualifications . . . as may be necessary . . . to provide services in accordance with this Agreement."[76] They must also be fluent in English, authorized to work in the United States, and complete the alcohol, drug, and background screening requirements.[77] The agreement also provides that the Contractor Worker "will conduct business with [HII] management, employees, and customers in a courteous and professional manner."[78]

Because these facts distinguish this case from Yellow Book Sales & Distrib., HII's argument is unpersuasive and its reliance on that case is misplaced.

---

[72] Id.

[73] Id.

[74] Trial Exhibit 20 §§ 3a, 3c, 3d, 3j, 6; Administrative Record at 93.

[75] Id. §§ 3a, 3c, 3d, 3j.

[76] Id. § 3d.

[77] Id. § 3c.

[78] Id. § 3i.

HII argues that the drivers' vehicles are the primary object of the contract. It specifically argues that the vehicles are essential because the drivers could not timely complete deliveries without a vehicle.

But as we previously noted in this opinion, the supreme court clarified in White that the use of ordinary hand tools, by itself, does not make those tools the essence of a contract. The vehicles here are the analytical equivalent of the ordinary tools there. They are not specialized equipment.

HII also argues that PharMerica requires the drivers to agree to background checks and drug tests and that HII "does not care who completes the deliveries." This argument does not alter our analysis. The point is that the requirement, regardless of its origin, is part of the agreement between HII and each driver. That is the correct focus of our analysis. HII is not relieved of the obligation to pay premiums just because an agreement requirement originates from its customer, PharMerica. Specifically, "[i]f the realities demonstrate the labor is for [the contracting firm's] benefit, the existence of a third party customer does not place the worker outside the scope of industrial insurance coverage."[79] That is the case here.

Lastly, HII argues that the drivers were not hired for any specialized skill, which indicates that their personal labor was not the essence of their contract. But contracting with workers without any specialized skill does not mean they do not provide personal labor.[80] So, this argument is unconvincing.

---

[79] Dana's Housekeeping, Inc., 76 Wn. App. at 608.

[80] See id.

*Employment of Others*

HII argues that the drivers' personal labor was not the essence of their contracts, claiming that they could and did use others to make deliveries. We disagree.

Under the third test of White, personal labor is not the essence of a contract if an independent contractor "of necessity or choice *employs* others to do all or part of the work he has contracted to perform . . . ."[81] There, the Whites actually employed another person to assist them in the log processing with the donkey engine. We read the supreme court's decision to require actual employment, not just the ability to employ another, to come within this category.

The supreme court's recent decision in Lyons Enterprises Inc., confirms that this view is correct.

There, Lyons maintained that because the franchise agreement contemplated that franchisees *may* hire subordinates, they met White's third test and, thus, were outside of the act's definition of "worker."[82]

The supreme court disagreed, stating:

> The fact that a franchisee could hire a subordinate is insufficient to exempt an employer from IIA coverage. As the Court of Appeals explained, this court has already rejected such an argument.[83]

---

[81] White, 48 Wn.2d at 474 (emphasis added).

[82] Lyons Enters., Inc., 374 P.3d at 1106.

[83] Id. (citing Dep't of Labor & Indus. v. Lyons Enterprises, Inc., 186 Wn. App. 518, 533, 347 P.3d 464 (2015)).

It is beyond legitimate dispute that the proper test is *actual* employment, not the ability to employ others, for purposes of the third test under White.

Here, as in Lyons Enterprises Inc., the contract permits drivers to hire others to make deliveries.[84] One driver testified that he did not hire employees to perform the deliveries. The only other driver who testified said that he never had employees. There was no testimony or other evidence from the remaining 33 drivers involved in the determination on the question.

On this record, HII failed to show that the drivers actually "employ[] others to do all or part of the work [they] contracted to perform . . . ."[85] Accordingly, substantial evidence supports the BIIA's finding that the drivers' personal labor was the essence of their contract with HII. These findings support the BIIA's conclusion that the drivers are workers.

HII appears to argue that the BIIA disregarded evidence that drivers relied on others to perform deliveries, claiming this was error because there was no conflicting evidence. HII specifically relies on testimony from its CEO stating that drivers often "use employees or subcontractors to provide the labor needed." HII also relies on one driver's testimony stating that he uses others to handle his route when he is unavailable. But that same driver also testified he does not employ others. The BIIA was entitled to rely on this latter statement to make its factual determination in view of the conflicting evidence on this point. And the

---

[84] Trial Exhibit 20 §§ 2b, 3a, 3c, 6; Administrative Record at 93.

[85] White, 48 Wn.2d at 474.

BIIA was not required to accept the CEO's testimony in light of conflicting evidence on this point.

HII also argues that the critical inquiry is whether the agreement "clearly and unequivocally provides that the work to be performed can be delegated." In light of the supreme court's recent decision in Lyons Enterprises Inc., this argument is without any legal force.

HII cites Massachusetts Mutual Life Insurance Co. v. Department of Labor and Industries[86] in further support of its argument. That case is distinguishable.

There, this court concluded that contract agents who delegated significant portions of their duties were not workers because "the contracting parties contemplated the delegation of duties by the independent contractor."[87] But in that case, this court determined that the agents did in fact "delegate significant portions of their duties to others."[88]

Here, HII fails to show that the drivers delegated a significant portion of their delivery duties to others. There was no evidence from the two drivers who testified showing how often they used other drivers to cover their routes. And there was no evidence on this point from the remaining 31 drivers.

---

[86] 51 Wn. App. 159, 752 P.2d 381 (1988).

[87] Id. at 165.

[88] Id.

HII argues that declining to perform work falls within the White test and that the drivers who decline deliveries are not workers under the IIA. HII cites no authority to support this argument, and we need not further address it.[89]

## EXCEPTION TO "WORKER"

HII argues that the drivers fall under an express exception to RCW 51.08.180's "worker" definition. We hold that HII has failed in its burden to establish that the exception of RCW 51.08.195 applies to this case.

RCW 51.08.180 provides in relevant part:

"Worker" means every person in this state . . . who is working under an independent contract, the essence of which is his or her personal labor . . . or as *an exception to the definition of worker*, a person is *not* a worker if he or she meets the tests set forth in subsections (1) through (6) of RCW 51.08.195 . . . .[90]

RCW 51.08.195, the exception stated above, provides in relevant part:

As an exception to the definition . . . of "worker" under RCW 51.08.180, services performed by an individual for remuneration shall not constitute employment subject to this title if it is shown that:

(1) The individual has been and will continue to be free from control or direction over the performance of the service, both under the contract of service and in fact; and

(2) The service is either outside the usual course of business for which the service is performed, or the service is performed outside all of the places of business of the enterprise for which the service is performed, or the individual is responsible, both under the contract and in fact, for the costs of the principal place of business from which the service is performed; and

(3) The individual is customarily engaged in an independently established trade, occupation, profession, or business, of the same

---

[89] See Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 248, 350 P.3d 647 (2015); RAP 10.3(a)(6).

[90] (Emphasis added.)

nature as that involved in the contract of service, or the individual has a principal place of business for the business the individual is conducting that is eligible for a business deduction for federal income tax purposes; and

(4) On the effective date of the contract of service, the individual is responsible for filing at the next applicable filing period, both under the contract of service and in fact, a schedule of expenses with the internal revenue service for the type of business the individual is conducting; and

(5) On the effective date of the contract of service, or within a reasonable period after the effective date of the contract, the individual has established an account with the department of revenue, and other state agencies as required by the particular case, for the business the individual is conducting for the payment of all state taxes normally paid by employers and businesses and has registered for and received a unified business identifier number from the state of Washington; and

(6) On the effective date of the contract of service, the individual is maintaining a separate set of books or records that reflect all items of income and expenses of the business which the individual is conducting.

"All six subparts [of the statute] must be satisfied for the exception to apply—a contractor who does not meet any one of these conditions is a 'worker' for IIA purposes."[91] In Lyons Enterprises Inc., the supreme court recently stated what the plain words of this statute make clear: Failure to meet any subsection of this statute precludes the application of this exception.[92]

In this case, the parties dispute whether one or more of the six subsections applies to the drivers. For example, the Department concedes that the 33 drivers probably meet the second of the above subsections of the test.

---

[91] Lyons Enters., Inc., 186 Wn. App. at 536.

[92] Lyons Enters., Inc., 374 P.3d at 1107.

But, as the Department correctly argues, this is immaterial to the outcome here because all six subsections must be met for each driver for the exception to apply. We agree with this view.

*Control or Direction*

HII has the burden to establish that it does not have the right to control the drivers.[93] We hold that it has failed to meet this burden.

Under RCW 51.08.195(1), an independent contractor is not a "worker" if "[t]he individual has been and will continue to be free from control or direction over the performance of the service, both under the contract of service and in fact." A contractor is "free from direction or control" if the individual is responsible for providing a service without the contracting firm's "direct supervision over the . . . methods and details of performance or having the right to exercise that authority under the contract."[94]

Here, when we consider the realities of the situation, HII exercises direction and control over the drivers' performance.

As we previously explained in this opinion, the agreement contains a lengthy "Manner of Performance of Service" provision detailing driver requirements and responsibilities.[95] One section states that the contractor is "solely responsible" for providing services "in a courteous, efficient, expeditious,

---

[93] RCW 51.48.131; RCW 34.05.570(1)(a); B & R Sales, Inc., 186 Wn. App. at 375.

[94] WAC 296-17-31002.

[95] Trial Exhibit 20 § 3.

reliable, safe, and secure manner, and in all cases in accordance with" the contract requirements.[96] The contract requires that drivers provide HII with timely status reports for deliveries and directs what drivers must do to be compensated.[97] Drivers also may be required to wear uniforms and must wear identification badges with HII's name on it.[98]

The contract requires that drivers "diligently devote his[] best efforts, skill and abilities to comply with customer requirements and to faithfully enhance and promote [HII's] welfare and best interests."[99] Drivers must also "provide services within the time frame requested by the customer on 95% of Contractor's deliveries" and agree to drug testing and background checks.[100]

The contract also contains confidentiality and non-solicitation sections, stating that a driver can work for third parties, provided that their "performance of such services for others does not impair or impede the Contractor's performance of his[] duties and responsibilities under this Agreement."[101]

The contract further provides that HII can immediately terminate the contract in certain circumstances and that either party can terminate the contract

---

[96] Trial Exhibit 20 § 3a.

[97] Id. § 3f, Schedule A.

[98] Trial Exhibit 20 § 3g.

[99] Trial Exhibit 20 § 3i.

[100] Id. §§ 15-16, Schedule A.

[101] Id. § 6.

by giving the other party 14 days written notice.[102] Route drivers may choose to reject deliveries, but they must notify HII of such rejection.[103] A delivery rejection by route drivers generally constitutes a material breach of the contract and provides grounds for immediate contract termination.[104]

Additionally, the drivers are not free from HII's direction or control in fact. One stat driver, Keith Parker, testified to the delivery process, stating that he confirms the pickup of items with HII dispatch and later confirms the delivery with dispatch. He and Stat driver Charles Hawley also testified that they contact HII if there is a delivery issue, such as heavy traffic. HII's CEO also testified that customer complaints go to HII, who then investigates.

In sum, this evidence shows that HII directs the manner in which the drivers perform the services under the agreements. This evidence demonstrates that the drivers do not have "the responsibility to deliver a finished product or service without [HII] either exercising direct supervision over . . . methods and details of performance or having the right to exercise that authority under the contract."[105] Thus, substantial evidence supports the BIIA's finding that the drivers were not "free from the firm's control or direction over the performances of their service," "both under the contract of service and in fact."[106] These findings

---

[102] Id. § 12.

[103] Id. at Schedule A.

[104] Id.

[105] WAC 296-17-31002.

[106] Administrative Record at 8; RCW 51.08.195(1).

support the BIIA's conclusion that the drivers are not excepted from RCW 51.08.180's worker definition.

HII argues that it has no right to control the drivers, stating that the drivers are free to determine how to meet their delivery schedule, subject to customer requirements. HII relies on the fact that its customer sets the requirements that HII includes in its contracts. The fact that the customer sets the requirements is immaterial to the analysis. In any event, HII cites no authority for the proposition that third party requirements negate the contracting firm's control over the contractors.

HII's failure to establish that RCW 51.08.195(1) applies to any of the 33 drivers is dispositive. Regardless of whether HII establishes the application of the statute's other subparts to one of more of the drivers, the failure here makes the other subparts immaterial to the outcome. Thus, we need not address in this opinion any of the other subsections of this statute.

## "SOLE PROPRIETOR" EMPLOYMENT EXCLUDED

HII argues that the drivers are categorically excluded from coverage under the IIA because they are "sole proprietors." We again disagree.

HII argues that the plain language of RCW 51.12.020 categorically exempts all sole proprietors from coverage under the IIA. From this, it argues further that none of those of its drivers who are sole proprietors are "workers" under RCW 51.12.180. It further argues that case authority supports this argument.

29

RCW 51.12.020 provides in relevant part:

The following are the only employments which shall not be included within the mandatory coverage of this title:

. . . .

(5) Sole proprietors or partners.

We interpret statutes to determine and apply the legislature's intent.[107] The legislature's intent is solely derived "from the statute's plain language, considering the text of the provision at issue . . . ."[108] We "look to the statute's plain and ordinary meaning, reading the enactment as a whole, [and] harmonizing its provisions by reading them in context with related provisions."[109] We must also avoid absurd results when interpreting statutes.[110]

We review de novo questions of statutory interpretation.[111]

Here, we must harmonize three statutes: RCW 51.08.180, RCW 51.08.195, and RCW 51.12.020(5). In doing so, we must avoid absurd results.

RCW 51.08.180 provides that "every person in this state . . . who is working under an independent contract, the essence of which is his or her personal labor" is a "worker" under the IIA. This is so, unless the person satisfies the exception explicitly listed in the statute. The word "person" is sufficiently

---

[107] See Segura v. Cabrera, 184 Wn.2d 587, 593, 362 P.3d 1278 (2015).

[108] Id. at 591.

[109] Id. at 593.

[110] State v. Larson, 184 Wn.2d 843, 851, 365 P.3d 740 (2015).

[111] W. Plaza, LLC v. Tison, 184 Wn.2d 702, 707, 364 P.3d 76 (2015).

broad to include one who operates a business as a sole proprietor. That a "person" works under "an independent contract" does not change this.

As we stated previously in this opinion, RCW 51.08.195 states the exceptions to worker status under RCW 51.08.180. Nowhere among the six subcategories of this statute is there an exemption for "sole proprietors."

RCW 51.12.020(5) provides that sole proprietors "shall not be included within the mandatory coverage" of the IIA. A sole proprietorship is "[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity."[112]

Here, the question is whether the last of these three statutes categorically exempts sole proprietors from the operation of RCW 51.08.180, which defines workers. We conclude that cannot be the legislature's intent.

We start with the legislature's declaration of policy respecting the IIA. RCW 51.12.010 states as follows:

> There is a hazard in all employment and it is the purpose of this title to embrace all employments which are within the legislative jurisdiction of the state.
>
> ***This title shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment.***[113]

With this declaration of policy in mind, we must be cautious in construing RCW 51.12.020(5) to categorically exclude all sole proprietors from coverage

---

[112] Sole Proprietorship, BLACK'S LAW DICTIONARY 1607 (10th ed. 2014).

[113] (Emphasis added.)

31

under the IIA. We believe that to do otherwise is inconsistent with the stated mandate to reduce to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment.

We note that neither RCW 51.08.180 nor the exception to "worker" status under RCW 51.08.195 references RCW 51.12.020(5)'s sole proprietor exclusion. We hold that the most reasonable way to harmonize interpretation of these three statutes is to conclude that the legislature intended to include within the scope of "worker" those sole proprietors who met RCW 51.08.180's requirements and who were not excluded by RCW 51.08.195. Thus, even though a person may choose to set up his or her business as a sole proprietorship, that alone does not exclude that person from IIA coverage as a "worker." No other interpretation of these statutes makes sense.

HII argues that 12 of the drivers were sole proprietors and thus excluded from coverage under the IIA. It cites two cases in support of this argument. Neither case requires a different result here.

Department of Labor and Industries v. Fankhauser[114] is one case on which HII relies. In that case, the supreme court stated that sole proprietors "are expressly excluded from mandatory coverage and are not required to participate in Washington's workers' compensation system."[115] It also stated that sole

---

[114] 121 Wn.2d 304, 849 P.2d 1209 (1993).

[115] Id. at 309.

proprietors are not considered workers automatically covered under the statute and can opt into the workers' compensation system.[116]

But that case is distinguishable. There, the issue was whether two people were barred from receiving workers' compensation under the "last injurious exposure" rule.[117] The individuals were exposed to asbestos during employment that was covered under the IIA, but their latest exposure occurred while they were self-employed.[118] The supreme court was neither asked to address nor did it address the issue in this case: whether persons who are independent contractors are "workers" under RCW 51.08.180. Thus, the broad language in that case on which HII relies does not control the outcome here.

HII also cites <u>Dosanjh v. Bhatti</u>.[119] That case is even more attenuated than <u>Fankhauser</u>, which it quotes. That was a wrongful death lawsuit discussing, in part, whether the IIA prohibited tort suits between coworkers.[120] Obviously, that is not the issue here.

HII also refers to the Department manual to support its argument, which states "[t]he excluded employments in RCW 51.12.020 are exempt from mandatory coverage regardless of whether the individual supplies only their

---

[116] <u>Id.</u>

[117] <u>Id.</u> at 306.

[118] <u>Id.</u>

[119] 85 Wn. App. 769, 934 P.2d 1210 (1997).

[120] <u>Id.</u> at 774-75.

personal labor."[121] The chief problem with this argument is that even if we were to accept the proposition that a Department manual necessarily correctly states the law, HII fails to show that it relied, to its detriment, on this manual. Thus, this argument is unpersuasive and we reject it.

HII also argues that the sole proprietor exclusion statute is specific and that the "worker" statute is general. Thus, it argues that where these statutes conflict, the sole proprietor exclusion statute controls.

But our courts do not apply this rule when statutes do not conflict.[122] The rule applies only after a court attempts to read statutes governing the same subject matter and "conclude[s] that the statutes conflict to the extent they cannot be harmonized."[123] We have harmonized these statutes, and this rule simply does not apply.

Lastly, HII argues that the sole proprietor exception is met here "by anyone who was registered as [such] during the audit period." HII cites no authority to support this argument. Accordingly, we do not address it further.

---

[121] Trial Exhibit 34.

[122] O.S.T. ex rel. G.T. v. Regence BlueShield, 181 Wn.2d 691, 701, 335 P.3d 416 (2014).

[123] Id.

## REASONABLENESS OF PENALTIES

HII assigns error to the BIIA's determination that the Department assessed reasonable penalties for the violation of the statutes. But HII fails to argue this point on appeal. Accordingly, any challenges to this determination are waived.[124]

We affirm the superior court judgment affirming the BIIA's decision and order.

_Cox, J._

WE CONCUR:

_____

_____

---

[124] See RAP 10.3(a)(6); Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845-46, 347 P.3d 487, review denied, 184 Wn.2d 1011 (2015).